**IN THE SUPERIOR COURT OF GUAM**

| | |
|---|---|
| IN THE MATTER OF THE ESTATE OF JUAN OJEDA AFLAGUE, Deceased, By: REMILYN D. AFLAGUE, Petitioner. | Probate Case No. PR0059-17 **DECISION AND ORDER** |
| TOMMY H.S. AFLAGUE Plaintiff, vs. REMILYN D. AFLAGUE. Defendant | |

**INTRODUCTION**

This will contest case came before the Honorable Michael J. Bordallo for a bench trial on April 12, 2019. Objector/Plaintiff Tommy H.S. Aflague is represented by Attorney Georgette Bello Concepcion. Petitioner/Defendant Remilyn D. Aflague ("Remilyn") is represented by Attorney William Benjamin Pole. Having considered the parties' arguments and the applicable law, the Court hereby finds that Juan Ojeda Aflague's holographic will is valid.

ORIGINAL

## FACTS

1. Juan Ojeda Aflague ("Decedent") died at age 74 on January 13, 2013.

2. He was survived by his wife, Remilyn D. Aflague (the petitioner and defendant), and four sons: Tommy H.S. Aflague ("Tommy") (the will contestant and plaintiff), John E.S. Aflague, Mark D. Aflague ("Mark"), and Frankie S. Aflague. Frankie Aflague passed away on December 25, 2018.

3. Remilyn is not the mother of the four sons. She married Decedent in 2005 after the sons became adults and Decedent had divorced the sons' mother.

4. Remilyn has produced a holographic will that Decedent purportedly wrote on August 13, 2012.

5. On April 25, 2017, Remilyn filed a Petition for Letters Testamentary with Will Annexed seeking the admission of the purported will. About five months later, on September 7, 2017, Tommy contested the will by filing a Contest to Probate and Validity of Will. Two weeks later, Remilyn filed a First Amended Answer to Will Contest.

6. Each son contests the will on two grounds. First, they state that they do not recognize the handwriting in the will to be their father's. Second, they argue that they do not believe their father had the mental capacity to understand his actions in creating the will and that Remilyn exercised undue influence on Decedent in getting him to execute the will entirely in her favor.

7. The bench trial took place on April 12, 2019. At trial, testimony was given by Remilyn as well as by two of the sons, Tommy and Mark.

8. Throughout the trial, Tommy and Mark were asked to identify whether they recognized certain signatures as their father's. In every signature that both Tommy and Mark claim

to be their father's, the first name "Juan" is spelled out, and in the signatures they claim are not their father's, there are only initials.

9. The capital letter "A" is noteworthy in the signatures of "Aflague." In every signature that Tommy and Mark claim was written by their father, the capital A is written in the style of a classic cursive A, as "a," while in every signature that Tommy and Mark claim is not their father's, the capital A is written in the style with a point at the top and a crossbar, as "A."

10. Tommy testified that the capital A in Aflague written by his father was always a circular A, not an up-and-down pointed A.

11. The purported will is composed of two sheets of white, unlined paper. Everything written on the pages is handwritten in what appears to be pen, although it is very clear that at least two distinct styles and colors of pen were used for various portions of the will. This is not apparent looking at photocopies of the will, but the writing on the original will shows that at least two types of pen were used.

12. The front of the first page has handwritten instructions stating, "Lyn, this what have to do every time." It then lists various monthly bills that must be paid and explains that the post office box must be paid for each year. Tommy testified that the front of the first page was written in his father's handwriting.

13. The back of the first page states the following, with capitalization mistakes and other errors retained: "After you Receive the insurance money, go Back To the Philippines and start a Bisnessed [sic] for yourself. Come Back Every so you could maintain your Green Card." It is then signed with what appears to be two initials, "J" and possibly "S" or "O" followed by the last name "Aflague." Remilyn argues that this is Decedent's signature. Farther down on the back of the first page but with a different pen, it states:

"This House Belong To my Remilyn Aflague." It is signed in more or less the same style, "J. O. Aflague" and dated August 13, 2012.

14. The front of the second page states: "Because Rebemyn (handwritten name is not fully legible) is so good a wife, everything I own Belong to her when I pass away." It is signed with more or less the same "J. O. Aflague" and dated August 13, 2012. Under that writing and with a different style and color of pen, it states: "NO ONE of my kids will has To Right To Fight The message. I write This Because Remilyn doesn't the Law." It is then signed with three initials that generally appear to be "J. O. A."

15. The back of the second page is blank.

16. Decedent became sick with cancer in early 2012 and began to undergo medical treatment, including chemotherapy. He also began to take morphine for pain management.

17. At trial, Remilyn testified that on August 13, 2012, Decedent, now wheelchair bound, asked her for pen and paper. She was cleaning in the kitchen at the time, and she testified that she brought him the pen and paper. Then she returned to the kitchen. He called her over later and she testified that he had written what has been submitted as his holographic will. She stated that he then directed her to take him outside where he indicated that she would own the house and property, and he pointed out the property boundaries.

18. Both Tommy and Mark have testified that the signatures in the various places on the purported will are not their father's signatures. During Mark's testimony, after a long pause while apparently thinking and studying the will, Mark stated that some of the writing of the will's contents could be his father's handwriting, but he reiterated that the signature does not appear to be his father's. In general, during his testimony, Mark did

not seem entirely sure about whether certain handwriting in the will was his father's, though he always stated that the signatures were not.

19. When Tommy was asked whether he recognized the handwriting on the back of the first page of the will to be his father's, excluding the signatures themselves, he appeared to think and study during a long pause before saying it could be his father's, but he fixated on the signature which he denied was his father's signature.

20. Looking at the portions of the will on the front of the second page, Tommy said it was not his father's handwriting because he said his father never wrote in cursive and some portions of the will are written in cursive.

21. Exhibit C, admitted at trial, is a typed letter from Decedent to Governor Edward B. Calvo, then-governor of Guam, with a date of June 21, 2012. In the letter, Decedent requested that Mark's incarceration sentence be commuted. At the bottom of the letter is Decedent's signature. Tommy testified that the signature is his father's and that he drafted the letter on behalf of his father. He also testified that his father was aware and understood that he was signing a letter requesting that Mark's sentence be commuted. The signature on that letter is written as follows: "Juan O. Aflague." At trial, Mark testified that he recognized the signature on the Calvo letter as his father's.

22. Tommy also testified that the signature on an earlier draft of the Calvo letter, admitted as Exhibit B, was an authentic signature written by his father. That letter was dated June 18, 2012, three days before the Exhibit C Calvo letter. The signature on the June 18 draft of the letter is also written as "Juan O. Aflague."

23. Mark agreed that in June 2012, when the Calvo letter was signed, his father was of sufficiently sound mind to understand what he was signing. He testified that his father continued to undergo cancer treatment during July and August 2012, but Mark was

incarcerated starting June 22, 2012, and therefore did not see his father much during those months. However, Mark explained, he was allowed brief visits to see his father during that time, escorted by Department of Corrections officials. Remilyn's attorney explained that the line of questioning used to elicit that information was intended to establish that Mark believed his father to have full mental capacity only two months before the will was written but that Mark could not know whether his father had deteriorated mentally by August 2012 when the will was written because Mark was not around enough to notice.

24. Mark was asked to identify whether the handwriting on two receipts, marked Exhibits 4 and 5, was his father's. Exhibit 4 was dated 1985 and Exhibit 5 was dated 2003. Both contain a signature of "J. O. Aflague." Mark testified that neither receipt was in his father's handwriting and that his father never signed with just initials but always spelled out "J-U-A-N." Tommy also testified that he never saw his father use only initials in his signatures.

25. Mark testified that the signature on Decedent's passport, submitted as Exhibit 3, was his father's handwriting. The signature is written as "Juan O. Aflague."

26. Tommy testified that Exhibit A, a land deed admitted at trial, also contains his father's signature. On that deed, the signature reads "Juan O. Aflague."

27. Tommy testified that Decedent was undergoing chemotherapy in June 2012 up until possibly August 2012. Tommy stated that at that point, around August, his father would become quickly exhausted. Tommy testified that from what he understood, his father was on morphine and other medications around the time the will was purportedly written, although he did not know exactly how much his father took or the schedule of taking medication. He stated that his father was not always awake during visits, which

occurred every Sunday after church with Tommy and his children. He stated that his father never left his bedroom during those visits.

28. Tommy testified that from June 2012 until August 2012, his father declined in health and in strength and that gave him reason to believe that although his father was of sound mind in June 2012, he may not have been at the time of the purported will's writing in August 2012.

29. When Tommy was presented with Exhibit 4, the receipt from 1985, he could not say whether the handwriting belonged to his father, but he did not believe the signature belonged to his father because it was the wrong capital A in Aflague and because it was written with initials instead of spelled out "Juan." Later, on redirect examination, Tommy stated more confidently that neither Exhibit 4 nor 5 was in his father's handwriting, including the signature.

## ISSUE

1. Whether to admit the purported holographic will to probate.

## LAW AND ANALYSIS

Guam law states that "[e]very adult person of sound mind may dispose of his separate property, real and personal, by will." 15 GCA § 101(a). A "holographic" will is a will that is written, dated and signed by the hand of the testator himself. 15 GCA § 207(a). "No formalities are necessary for [a holographic will's] making or execution except as set forth in this subsection, and it need not be witnessed." *Id.* There is very little case law from our jurisdiction regarding holographic wills, so the Court will look to other jurisdictions for guidance. California's Sixth District Court of Appeal has stated that whether to admit a holographic will to probate depends on "proof of its authorship and authenticity, and whether the words establish

that it was intended to be the author's last will and testament at the time she [or he] wrote it." *Estate of Williams*, 66 Cal. Rptr. 3d 34, 42 (2007).

Further, the signature on a holographic will need not be at the end of the document, "so long as it appears from the document itself that the signature was intended to authenticate the document." *Estate of Williams* at 42. Finally, "courts are to use common sense in evaluating whether a document constitutes a holographic will." *Id.*

### a. Burden of proof in challenging a purported holographic will

When a petition for probate of a will and a contest to the will are tried at the same time, the proponent of the will must first present preliminary proof in support of the petition, and the proponent bears the burden of proof. *See generally In re Latour's Estate*, 74 P. 441, 441 (Cal. 1903). A prima facie case is made when it is shown that all the requirements of law have been observed in the execution of the will. *Estate of Erickson v. Misaka*, 766 P.2d 1085, 1087 (Utah Ct. App. 1988). "Proof of the signatures of the testator and the witnesses, on its own, makes out a prima facie case of due execution." *Estate of Hemlani*, 2008 Guam 25 ¶ 43. "A showing that a holographic will is in the handwriting of deceased, dated and signed creates a prima facie case for admittance of the will to probate." *Matter of Wilder's Estate*, 554 P.2d 788, 789 (Okla. 1976).

If the showing of a prima facie case is challenged because the handwriting of the will is at issue, the burden of proof lies on the proponent to show that the alleged holographic will was wholly in the handwriting of the decedent. *In re Estate of Johnson*, 886 S.W.2d 869, 871 (Tex. App. 1994). The California Fourth District Court of Appeal has stated, "[t]he trier of fact can determine the issue by comparison of the questioned writing with 'genuine' or admitted handwriting of the testator without the aid of the oral testimony of any witness." *Estate of Nielson*, 165 Cal. Rptr. 319, 321 (Ct. App. 1980); *see also In re Johnson's Estate*, 252 P. 1049,

1051 (Cal. 1927). The court adds, "no handwriting expert or testimony [is] necessary." *Nielson* at 321. The factual question of whether the handwriting is that of the Decedent is to be determined by a preponderance of the evidence. *See Wilson v. Kemp*, 7 Ark. App. 44, 48, 644 S.W.2d 306, 309 (1982).

As the trier of fact, the Court must determine by a preponderance of the evidence whether the will was in fact written by Decedent. The Court finds that Remilyn has established a prima facie case that the holographic will has been duly executed because Remilyn has submitted that the proffered will has been written, signed, and dated all in the hand of Decedent.

Though circumstances surrounding the creation of the will have some irregularities that the Court finds noteworthy, the Court nonetheless finds that the will was handwritten by Decedent. While not exactly the same, the signature on the holographic will appears to be very similar to signatures provided by the contestants. For example, the last three letters in "Aflague" appear to be written in the exact same manner in the two signatures of the holographic will as in every signature provided by the contestants. Although the capital A in "Aflague" is different than the capital A on other signatures that the brothers claim to be authentic, the brothers offered very little evidence that this is far out of the ordinary for their father. The Court would expect many examples of Decedent's signature through years or even decades to establish how unusual it would be for him to change the capital letter A. With the evidence before it, the Court can accept that the capital A could likely vary from time to time and still be written by the same person. The same is true for their father's use of initials rather than spelling out his name. The Court would also expect testimony by disinterested parties as to the nature and makeup of the father's signature. Moreover, the sons were not always clear

burden to show by a preponderance of the evidence that the decedent lacked capacity. *Matter of Estate of Roosa*, 753 P.2d 1028, 1032 (Wyo. 1988).

The Court finds that the will demonstrates testamentary intent on the part of Decedent, in particular the words, "Because [Remilyn] is so good a wife, everything I own Belong to her when I pass away." The Court finds that the other parts of the two-page will are incorporated into a single document, as they appear to have been written at the same time and with the same intent.

Further, Tommy has not shown by a preponderance of the evidence that Decedent lacked testamentary capacity at the time he wrote the will. Although Decedent was being treated for cancer and had a morphine prescription, the brothers had little knowledge of the dosages or schedule with which Decedent took the medication, if he took it at all. Mark was incarcerated in August 2012, and he provided little testimony that he noticed any diminished mental capacity during his few escorted visits to his father. Both brothers testified that only two months earlier, Decedent was sufficiently lucid to understand and sign off on the contents of the letter to Governor Calvo. Because little other evidence was provided of Decedent's diminished mental capacity, the Court does not find that Decedent lacked testamentary capacity when he wrote the will.

### c. Fraud or undue influence

With regard to a will created by fraud or undue influence, Guam law states: "A will or part of a will procured to be made by duress, menace, fraud or undue influence, may be denied probate; and a revocation procured by the same means may be declared void." 15 GCA § 105. A presumption of undue influence requires the presence of the following three elements: "(1) the existence of a confidential or fiduciary relationship between the testator and the person alleged to have exerted undue influence; (2) active participation by such person in preparation

or execution of the will; and (3) an undue benefit to such person or another person under the will thus procured." *Estate of Gelonese,* 111 Cal. Rptr. 833, 837 (Ct. App. 1974).

The District Court of Guam has stated about undue influence, "[t]he general rule is that the contestants of a will have the burden of proving undue influence." *In Matter of Estate of Borja,* No. CV96-00044A, 1997 WL 208982, at *4 (D. Guam Apr. 21, 1997); *see also, e.g. Masters v. Ries,* No. D070963, 2017 WL 1075065, at *6 (Cal. Ct. App. Mar. 22, 2017); *In re Lingenfelter's Estate,* 241 P.2d 990, 996 (Cal. 1952). The *Borja* court then added, "[i]f a presumption of undue influence applies, however, the burden of proof shifts to the will's proponent to show the absence of undue influence." *Id.* The court noted that the burden of proof for both parties is a preponderance of the evidence. *Id.* at n.7; *see also In re Lingenfelters's Estate* at 996.

The Court finds that Tommy has not shown by a preponderance of evidence a presumption of undue influence by Remilyn on Decedent in creating the purported will. Though the Court finds that there was a confidential relationship between Remilyn and Decedent because they lived together as spouses, spent large quantities of time alone together, and she was the main care provider for him during his illness, Tommy fails to satisfy the remaining elements needed to demonstrate a presumption of undue influence.

Tommy has not demonstrated by a preponderance of the evidence that Remilyn actively participated in the preparation or execution of the will. The only evidence of Remilyn's participation in creating the will is from her own testimony that one day she provided Decedent with pen and paper and then went outside with Decedent so that he could show her the property boundaries of their marital home. Tommy has submitted no evidence that Remilyn further participated in the creation of the will. Apparently she did not know at the time that he intended to write a will on that paper. The Court concludes that merely handing paper and pen

to a testator to write a will does not constitute active participation in the preparation of the will. Because this element is not met, there is no presumption of undue influence.

With regard to the third required element for a presumption of undue influence, it appears that Remilyn would substantially benefit if the holographic will were probated, rather than applying Guam's succession laws. Still, because Tommy did not satisfy the second element, there is no presumption of undue influence.

## CONCLUSION AND ORDER

For the above reasons, the Court finds that Juan Ojeda Aflague's holographic will is valid and shall therefore be admitted to probate.

SO ORDERED, this /2 day of _August_ 2019.

HONORABLE MICHAEL J. BORDALLO
Judge, Superior Court of Guam

SERVICE VIA COURT BOX

I acknowledge that a copy of the original hereto was placed in the court box of:

Atty Georgette Concepcion
Atty William Pole

Date: 8·12·19 Time 3:15

Linda M. Perez
Deputy Clerk, Superior Court of Guam